1   Matthew K. Bishop
    Western Environmental Law Center
2   103 Reeder's Alley
    Helena, MT 59601
3   (406) 324-8011 (tel.)
    (406) 443-6501 (fax)
4   bishop@westernlaw.org

5   Sarah McMillan
    Western Environmental Law Center
6   Post Office Box 7435
    Missoula, MT 59807
7   (406) 728-5096 (tel.)
    mcmillan@westernlaw.org
8
    Attorneys for Plaintiff
9

10              IN THE UNITED STATES DISTRICT COURT
11               FOR THE DISTRICT OF MONTANA
                         MISSOULA DIVISION
12

13  MONTANA WILDERNESS ASSOCIATION,        )
    a non-profit organization,             )
14                                         )        CV-09-88-M-DWM
                                           )
15                                         )
                        Plaintiff,         )        COMPLAINT FOR
16                                         )        DECLARATORY AND
                 vs.                       )        INJUNCTIVE RELIEF
17                                         )
                                           )
18  GENE TERLAND, in his official capacity )
    as director of the Bureau of Land Management's )
19  Montana State Office; MIKE POOL, in his )
    official capacity as director of the Bureau of Land )
20  Management; the BUREAU OF LAND         )
    MANAGEMENT, an agency of the United States )
21  Department of Interior; and the UNITED STATES )
    DEPARTMENT OF INTERIOR, a federal      )
22  department,                            )
                                           )
23                                         )
                        Defendants.        )
24  _____)

25

26

27

28

INTRODUCTION

1.     Plaintiff, Montana Wilderness Association (MWA), brings this civil action for declaratory and injunctive relief against the above named Defendants (Bureau of Land Management or BLM) pursuant to the Administrative Procedure Act (APA), 5 U.S.C. § 701 et seq., for violations of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq., the Wild and Scenic Rivers Act (WSRA), 16 U.S.C. § 1271 et seq., the National Historic Preservation Act (NHPA), 16 U.S.C. § 470 et seq., the Federal Land Management Policy and Management Act (FLPMA), 43 U.S.C. § 1701 et seq., and Presidential Proclamation 7398, 66 Fed. Reg. 7359 (January 17, 2001), establishing the Upper Missouri River Breaks National Monument (the Proclamation).

2.  The Upper Missouri River Breaks National Monument (Monument) is a national treasure that contains a spectacular array of biological, geological, and historical objects of interests.

3.  The Monument includes the 149 mile Upper Missouri National Wild and Scenic River (UMNWSR) and adjacent breaks country, six Wilderness Study Areas (WSAs), the Cow Creek area of critical environmental concern (ACEC), some of the largest and most viable elk and big horn sheep herds in the United States, essential winter range for sage grouse, segments of the Lewis and Clark and Nez Perce National Historic Trails, important spawning habitat for the endangered pallid sturgeon, numerous archeological and historic sites, and some of the wildest country in the Great Plains.

4.  Today, the area included within the Monument remains largely intact and unchanged since Lewis and Clark first traveled through it on their epic journey in 1805.

5.  This civil action arises out of the BLM's December, 2008 Record of Decision (ROD) adopting a new Resource Management Plan (RMP) for the

Monument which authorizes an array of plan-level and site-specific activities that individually and in the aggregate fail to protect and harm the Monument's resources and integrity.

6. Specifically, the BLM's RMP authorizes oil and gas development, motorized boat use throughout the river corridor, motorized vehicle and ATV access via over 400 miles of roads, off-road camping and travel, six airstrips, livestock grazing within sensitive riparian areas and cottonwood galleries, animal damage control, new recreational facilities, and rights-of-way and utility corridors in the remotest and most sensitive portions of the Monument.

7. Wherefore, MWA – an organization dedicated to protecting and preserving the natural and historic resources of the Monument – is hereby compelled to pursue this civil action.

## JURISDICTION AND VENUE

8. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 (Federal Question).

9. This Court has the authority to review the BLM's action complained of herein, and grant the relief requested, pursuant to the APA, 5 U.S.C. § 701 et seq. MWA is challenging a final agency action and has exhausted all necessary administrative remedies.

10. The relief sought is authorized by 28 U.S.C. § 2201 (Declaratory Judgment), 28 U.S.C. § 2202 (Injunctive Relief), and 5 U.S.C. § 706 (APA).

11. Venue is properly before this Court pursuant to 28 U.S.C. § 1391(e).

12. There is a present and actual controversy between the Parties.

## PARTIES

13. Plaintiff, MONTANA WILDERNESS ASSOCIATION (MWA), is non-profit organization headquartered in Helena, Montana. MWA is committed to

PAGE 2  COMPLAINT  MWA v. TERLAND

protecting the Monument's natural resources, wilderness character, wildlife habitat, and traditional recreational opportunities.  MWA's mission is to educate Montanans on the value of wilderness and work with the public and political leaders to create new wilderness areas in the State.  MWA has approximately 5,000 members in the State of Montana.  Many of these members live near and/or use the Monument on a regular basis.

14.  MWA's  members and staff use the best available science to forward the organization's mission through participation in policy formation, administrative processes, public outreach, education, and, if need be, legal action.

15.  MWA's members and staff have a specific, concrete interest in protecting, preserving, and restoring the natural, biological and historical integrity of the Monument.  In fact, protecting the resources of the Monument is a major program effort for MWA.  MWA reports to its members, the public at large, and the press on the status of, and threats to the Monument.  MWA also prepares and submits comment letters and protests on various BLM projects, activities, and/or plans that may impact the Monument's resources.  MWA submitted comments on the BLM's draft environmental impact statement (DEIS) for the proposed management plan for the National Monument and protested the BLM's final environmental impact statement (FEIS) for the Monument.   MWA also filed a request for a stay and administrative appeal of the site-specific aspects of the RMP to the Interior Board of Land Appeals (IBLA).  MWA voluntarily dismissed this appeal when the IBLA denied MWA's request for a stay and allowed the RMP to go into effect.

16.  MWA's members and staff frequently communicate with various BLM officials, including biologists and other staff members about public lands management issues within or affecting the Monument.  MWA's members and staff frequently raise concerns about the direct, indirect, and cumulative impacts of

PAGE 3   COMPLAINT  MWA v. TERLAND

various land management actions on the Monument's resources.

17.  MWA's members and staff have used, and will continue to regularly and repeatedly use the Monument.  MWA's members and staff use the Monument for wildlife observation, research, aesthetic enjoyment, canoeing, hiking, bird watching, historic exploration, and other recreational, scientific, and educational activities.  MWA's members and staff derive scientific, recreational, conservation, and aesthetic benefits from using the Monument.  MWA's members enjoy hunting and viewing (and being aware of) wildlife in the area and experiencing the Monument's historic significance, wilderness quality lands, wild and scenic river, diverse plant communities, and unique riparian areas and cottonwood galleries. For MWA's members and staff, using the Monument in conjunction with working to protect the Monument's resources is a key component of their enjoyment of their visits to the area.  MWA's members and staff will continue working for the protection and restoration of the Monument's resources.  Filing this civil action to ensure compliance with federal law is part of this effort.

18.  The BLM's RMP for the Monument harms MWA's concrete interests. The BLM's RMP which authorizes excessive oil and gas development, power boat use, motorized access, six recreational airstrips, new recreational facilities, and rights-of-way and utility corridors in the remotest and most sensitive portions of the Monument harms MWA's members' and staffs' ability to use and enjoy the Monument for scientific, recreational, conservation, and aesthetic purposes.

19.  The BLM's preparation of an EIS, issuance of a ROD, and adoption of a new RMP without complying with NEPA, WSRA, FLPMA, NHPA, and the Proclamation also results in uninformed decisions and creates an increased risk of actual, threatened, and imminent harm to MWA's members' interests in protecting and restoring the resources of the National Monument.  The BLM's failure to comply with NEPA, WSRA, FLPMA, NHPA, and the Proclamation also

1   significantly increases the risk of unnecessary and avoidable harm to the

2   Monument's natural, biological, and historic resources and to MWA's concrete

3   interests in protecting, preserving, and using those resources. The BLM's failure

4   to comply with NEPA, WSRA, FLPMA, NHPA, and the Proclamation adversely

5   affects and continues to adversely affect the interests of MWA and its staff and

6   members. MWA brings this action on behalf of itself and its adversely affected

7   members and staff.

8   20.  If this Court orders the BLM to comply with NEPA, WSRA, FLPMA,

9   NHPA, and the Proclamation as requested by this civil action, then the harm to

10  MWA's interests would be alleviated.

11  21.  Defendant GENE TERLAND, is named in his official capacity as the

12  director of the BLM's Montana State Office.  As the director of the Montana State

13  Office, Mr. Terland is the federal official with responsibility for all of the BLM

14  officials' inactions or actions challenged in this complaint.

15  22.  Defendant MIKE POOL, is sued in his official capacity as the current

16  director of the BLM.  As the current director of the BLM, Mr. Pool is the federal

17  official with responsibility for all of the BLM officials' inactions or actions

18  challenged in this complaint.

19  23.  Defendant BUREAU OF LAND MANAGEMENT (BLM) is an agency

20  within the U.S. Department of Interior that is responsible for applying and

21  implementing the federal laws and regulations challenged in this civil action.

22  24.  Defendant UNITED STATES DEPARTMENT OF INTERIOR (DOI) is

23  a department of the United States Government with supervisory and managerial

24  responsibility over the BLM and is responsible for applying and implementing the

25  federal laws and regulations challenged in this civil action.

26

27

28  PAGE 5   COMPLAINT  MWA v. TERLAND

BACKGROUND

The Upper Missouri River Breaks National Monument.

25.  On January 17, 2001 President Clinton established the Upper Missouri Breaks National Monument under the provisions of the Antiquities Act of 1906.

26.  The Monument includes approximately 375,000 acres of BLM land in north-central Montana's Blaine, Chouteau, Fergus, and Phillips counties.

27.  From Fort Benton to the Charles M. Russell National Wildlife Refuge, the Monument spans 149 miles of the Upper Missouri River, the adjacent "Breaks" country, and portions of Arrow Creek, Antelope Creek, and the Judith River.

28.  The National Monument contains an array of biological, geological, and historical objects of interest.

29.  The Monument is covered with sedimentary rocks deposited in shallow seas that covered central and eastern Montana during the Cretaceous period. Glaciers, volcanic activity, and erosion have since folded, faulted, uplifted, and sculpted the landscape to the majestic form it takes today.

30.  Lewis and Clark first encountered the Monument's breaks country on their westward leg in 1805.  In their journals, Lewis and Clark describe the area's unique landscape, white cliffs, and abundant wildlife of the area including mule deer and elk.  The expedition also recorded the first big horn sheep observation by non-Indians in the Monument.

31.  The area included within the Monument has remained largely unchanged since 1805 and many of the objects and landmarks described by Lewis and Clark are still found in the area.

32.  The Monument includes the most viable elk herd in Montana and one of the premier big horn sheep herds in the continental United States.

33.  The Monument contains essential winter range for sage grouse as well

PAGE 6  COMPLAINT  MWA v. TERLAND

as habitat for prairie dogs (Lewis sent President Jefferson a prairie dog from this area, noting that the animal was "new to science").

34.  The lower reach of the Judith River in the Monument, just above its confluence with the UMNWSR contains one of the few remaining fully functioning cottonwood gallery forest ecosystems on the Northern Plains.

35.  Arrow Creek (originally called Slaughter Creek by Lewis and Clark) contains the largest concentration of antelope and mule deer in the Monument and is important spawning habitat for the endangered pallid sturgeon.  Arrow Creek is also a critical seed source for cottonwood trees for the flood plain along the Missouri.

36.  The cliff faces  in the Monument provide perching and nesting habitat for many raptors, including sparrow hawk, ferruginous hawk, peregrine falcon, prairie falcon, and golden eagle.  Several pairs of bald eagles also nest in the Monument and other pairs of eagles visit in late fall and early winter.

37.  Shoreline areas in the Monument provide habitat for great blue heron, pelican, and a wide variety of waterfowl.

38.  The river and its tributaries in the Monument host forty-eight fish species, including goldeye, drum, sauger, walleye, northern pike, and channel catfish.

39.  The Monument has one of the six remaining paddlefish populations in the United States.  The river also supports blue sucker, shovel nose sturgeon, sicklefin, sturgeon chub, and the endangered pallid sturgeon.

40.  The Bullwhacker area of the Monument contains some of the wildest country on all the Great Plains, as well as important wildlife.

41.  During the stress-inducing winter months, mule deer and elk move up the Bullwhacker area from the river and antelope and sage grouse move down to the area from the benchlands.

PAGE 7   COMPLAINT  MWA v. TERLAND

42.  The heads and coulees and breaks in the Bullwhacker area also contain archeological and historical sites, from teepee rings and remnants of historic trails to abandoned homesteads and lookout sites used by Lewis and Clark.

43.  Before the time of Lewis and Clark, the Monument area was inhabited by numerous native tribes, including the Blackfeet, Assiniboin, Gros Ventre, Crow, Plains Cree, and Plains Ojibwa.

44.  The confluence of the Judith and Missouri River was the setting for important peace councils in 1846 and 1855.

45.  In 1877 the Nez Perce crossed the Missouri and entered the Breaks country in their attempt to escape to Canada.  The Cow Island skirmish occurred in the area and was the last encounter prior to the Nez Perce surrender to the U.S. Army.

46.  The Monument encompasses the entire UMNWSR and segments of the Lewis and Clark National Historical Trail, the Nez Pierce National Historic Trail, six WSAs, and the Cow Creek Island ACEC.

The BLM's RMP for the Monument.

47.  On December 4, 2008 the BLM signed a final ROD approving a new RMP for the Monument.

48.  The RMP for the Monument replaces the relevant decisions in the West HiLine RMP, Judith-Valley-Phillips RMP, UMNWSR Management Plan Update, and the State Director's Interim Guidance for Managing the Monument.

49.  The RMP includes land use planning level decisions (land use allocations, desired future conditions) and site-specific implementing decisions that are either finalized with the ROD and FEIS and thus require no further environmental analysis (e.g., road system, airstrips, motorized boating, camping facilities, season of use) or require additional site-specific planning and analysis.

Oil and gas development

50.  The BLM's RMP asserts without analysis that 43 federal oil and gas leases in the Monument have valid existing rights.

51.  The 43 oil and gas leases recognized by BLM as having valid existing rights are divided into two categories: leases issued under the West HiLine RMP and non-West HiLine leases.

52.  The BLM's RMP states that in addition to lease stipulations, reasonable conditions of approval will be applied to all applications to drill (APDs) in order to protect the Monument's objects.

53.  The BLM did not include the 43 oil and gas leases in the Monument or any APD for such leases among the five implementing decisions described in the EIS for which the necessary site-specific planning and NEPA analysis was completed.

54.  The BLM's EIS  for the  RMP does not include the necessary site-specific planning and NEPA analysis for the 43 oil and gas leases in the Monument or for any APD for such leases.

Aviation

55.  The BLM's RMP authorizes six recreational airstrips for private aircraft (planes, helicopters, hot air balloons, or ultralights) in the Monument.

56.  The six airstrips authorized in the Monument are Black Butte North, Bullwhacker, Cow Creek, Knox Ridge, Left Coulee and Woodhawk.

57.  Five of the six airstrips will be open yearlong while the Woodhawk airstrip will be restricted seasonally.

58.  The BLM will allow maintenance of the airstrips.  Use of mechanized maintenance, improvements, facilities, or infrastructure (tie downs, wind socks, airstrip delineators etc.) will require approval from BLM.

59.  The BLM has never previously authorized the construction or use of these six recreational airstrips or analyzed the impacts of the airstrips in an

PAGE 9  COMPLAINT  MWA v. TERLAND

1    environmental analysis.

2    <u>River use</u>

3    60.  The BLM's RMP authorizes motorized watercraft use of the entire 149

4    mile stretch of the UMNWSR with certain seasonal restrictions.

5    61.  The BLM's RMP authorizes motorized watercraft to travel both

6    upstream and downstream yearlong from river mile 0 (Fort Benton) to 52 (Pilot

7    Rock).  Personal watercraft and floatplanes will only be allowed in river miles 0 to

8    3 near Fort Benton.  River mile 0 to 52 is the recreational segment of the

9    UMNWSR.

10    62.  The BLM's RMP authorizes motorized watercraft to travel downstream

11    at a no-wake speed from June 15 to September 15 from river mile 52 (Pilot Rock)

12    to 85 (Deadman Rapids).  Motorized watercraft will be allowed to travel both

13    upstream and downstream the remainder of the year.  River mile 52 to river mile

14    85 is a wild segment of the UMNWSR.

15    63.  The BLM's RMP authorizes motorized watercraft to travel downstream

16    and upstream (without any speed restrictions) from River mile 84.5 (Deadman

17    Rapids) to 92.5 (Holmes Council Island).  River mile 84.5 to 92.5 is a recreational

18    segment of the UMNWSR.

19    64.  The BLM's RMP authorizes motorized watercraft to travel downstream

20    at no-wake speeds on Thursday through Saturday from June 15 to September 15

21    from River mile 92.5 (Holmes Council Island) to 149 (Fred Robinson Bridge).

22    Motorized watercraft will not be allowed in this segment of the river on Sundays

23    through Wednesdays from June 15 to September 15.  Motorized travel both

24    upstream and downstream will be allowed the remainder of the year.  River mile

25    92.5 to 149 is the wild and scenic segment of the UMNSWR.

26    65.  The BLM's RMP does not limit the number of people boating or

27    accessing the Missouri River.

28    PAGE 10   COMPLAINT  MWA v. TERLAND

66.   The BLM's RMP authorizes the construction of additional camping facilities in the UMNWSR corridor, between Fort Benton and Judith Landing, including level two campgrounds which are developed camps accessible by boat and may include vault toilets, metal fire rings, and open-air shelters.

Travel planning

67.   The BLM's RMP defines a road as a linear "route segment that can be created by the passage of vehicles (two-track), constructed, improved, or maintained for motorized travel."

68.   The BLM's RMP designates 293 miles of roads in the Monument as open yearlong and an additional 111 miles of roads that are open with seasonal restrictions.

70.   The BLM's RMP authorizes off-road travel and travel on closed roads for oil and gas leasees and livestock grazing permittees in the Monument.

71.   The BLM's RMP authorizes off-road travel, parking, and dispersed camping within 50 feet of any road.

72.   The BLM's RMP authorizes motorized access to the wild segments of the UMNWSR.

Animal damage control

73.   The BLM's RMP authorizes the use of predator or animal damage control within the Monument when the control targets specific animals and health and safety factors are not an issue.

Livestock grazing

74.   The BLM's RMP continues to authorize livestock grazing in the Monument, including the Monument's sensitive riparian areas and cottonwood galleries.  The BLM's RMP and EIS does not address the impacts of grazing in sensitive areas and cottonwood galleries or develop a plan to protect and restore those areas.

75. Livestock grazing on allotments within the Monument will continue to be allocated at approximately 38,000 animal unit months (AUMs) of forage on an annual basis.

76. Range improvement projects in the Monument, including but not limited to fences, reservoirs, and other water developments will continue to occur in the same general manner and degree as they occurred before the Monument was established. New range improvements will also be allowed.

77. Livestock grazing permittees will be allowed upstream motorized travel in the UMNWSR to administer their grazing permit.

Utility corridors, transportation corridors, and rights-of-way

78. The BLM's RMP recognizes and authorizes seven utility and transportation corridors that cross the Missouri River and designates an eighth corridor (the Klabzuba pipeline) along the south side of the River.

79. The corridors will be available for all uses, including pipelines, transmission/power lines, and roads.

80. The BLM will also consider applications for rights-of-way in the Monument.

COUNT I

NEPA VIOLATIONS

81. Plaintiff repeats and incorporates by reference the foregoing paragraphs.

82. The BLM has violated, and continues to violate, NEPA.

83. NEPA requires the BLM to adequately consider and analyze the direct, indirect, and cumulative impacts of its RMP on the Monument's objects.

84. Indirect effects are caused by the action but occur later in time or are further removed in distance. 40 C.F.R. § 1508.8 (b).

85. Cumulative impacts are the impacts on the environment which result

"from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7.

86.  In issuing a ROD and new RMP for the Monument, the BLM failed to take a hard look at direct, indirect, and cumulative impacts to the Monument's objects, including but not limited to, the Monument's fish and wildlife resources, natural soundscape, threatened and endangered species, riparian areas, cottonwood galleries, the Bullwhacker area, Arrow Creek, Judith River, the wilderness character of the WSAs, the Cow Creek ACEC, and the UMNWSR's outstandingly remarkable values.

87.  NEPA requires the BLM to "rigorously explore and objectively evaluate" all reasonable alternatives.  40 C.F.R. § 1502.14.

88.  In issuing a ROD and RMP for the Monument, the BLM failed to rigorously explore and objectively evaluate all reasonable alternatives. The BLM also did not properly define the "purpose and need" of the action, thereby artificially limiting the range of alternatives considered.

89.  The BLM's failure to adequately consider and analyze direct, indirect, and cumulative impacts and failure to consider reasonable alternatives is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law " and constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706 (2)(A), 706 (1).

COUNT II

WSRA VIOLATIONS

90.  Plaintiff repeats and incorporates by reference the foregoing paragraphs.

91.  The BLM has violated, and continues to violate, the WSRA.

92.  The WSRA mandates that the UMNWSR be "administered in such a

1    manner as to protect and enhance the values which caused it to be included in said
2    system without, insofar as is consistent therewith, limiting other uses that do not
3    substantially interfere with public use and enjoyment of these values." 16 U.S.C. §
4    1281 (a).  In such administration, "primary emphasis shall be given to protecting
5    [the river's] esthetic, scenic, historic, archeologic, and scenic values." Id.

6    93.  The WSRA also directs the BLM and any other federal agency having
7    "jurisdiction over any lands which include, border upon, or are adjacent to any
8    [designated] river" to "take such action respecting management policies,
9    regulations, contracts, plans, affecting such lands . . . as may be necessary to
10   protect such rivers in accordance with the purposes of [the WSRA]." 16 U.S.C. §
11   1283 (a)

12   94.  The WSRA's protect and enhance mandate is "interpreted as stating a
13   non degradation and enhancement policy for all designated rivers, regardless of
14   classification." 47 Fed. Reg. at 39, 458.  Each "component will be managed to
15   protect and enhance the values for which the river was designated, while providing
16   for public recreation and resource uses which do not adversely impact or degrade
17   those values." Id.

18   95.  The 1993 management plan (update) for the UMNWSR states that the
19   outstandingly remarkable values that must be protected and enhanced are the
20   River's "scenic vistas, diverse wildlife species, breath taking geologic formations,
21   prehistoric and historic remains and the opportunity to experience solitude; all on
22   the last free-flowing stretch of the Missouri River."

23   96.  Three segments of the UMNWSR in the Monument are classified,
24   designated, and administered as "wild" which means they are to be free of
25   impoundments and generally accessible only by trail, with watersheds and
26   shorelines essentially primitive and waters unpolluted.  16 U.S.C. § 1273 (b).
27   Wild segments of the UMNWSR "represent vestiges of primitive America." 16

28   PAGE 14   COMPLAINT  MWA v. TERLAND

1  U.S.C. § 1273 (b).

2      97.  The BLM's RMP fails to protect and enhance the UMNWSR's

3  outstandingly remarkable values and is inconsistent with the river's "wild"

4  classification.

5      98.   The WSRA requires the BLM to address "user capacities" on the

6  UMNWSR. 16 U.S.C. § 1274 (d).  The BLM is required to establish the carrying

7  capacity of the river, deal with or discuss the maximum number of people that can

8  be received on the UMNWSR, and adopt some specific measurable limits on use.

9      99.  The BLM has not addressed user capacities on the UMNWSR by

10  establishing carrying capacity, dealing with or discussing the maximum number of

11  people that can be received, or by adopting any specific measurable limits on use

12  of the UMNWSR even though levels (and various types) of use are increasing in

13  the river corridor and the Monument.

14      100.  The BLM's failure to protect and enhance the UMNWSR's

15  outstandingly remarkable values and address user capacities is "arbitrary,

16  capricious, an abuse of discretion, or otherwise not in accordance with law " and

17  constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C.

18  §§ 706 (2)(A), 706 (1).

19                              COUNT III

20                         NHPA VIOLATIONS

21      101.  Plaintiff repeats and incorporates by reference the foregoing

22  paragraphs.

23      102.   The BLM has violated, and continues to violate, the NHPA.

24      103.  The NHPA requires the BLM to inventory, evaluate, and identify

25  cultural resources within the Monument (16 U.S.C. § 470h-2 (a)) and, before

26  issuing a ROD and approving the RMP for the Monument, to "take into account

27  the effect of the undertaking on any district, site, building, structure, or object that

28  PAGE 15  COMPLAINT  MWA v. TERLAND

is included in or eligible for inclusion in the National Register" and "afford the Advisory Council on Historic Preservation . . . a reasonable opportunity to comment with regard to such undertaking." 16 U.S.C. § 470f.

104.  The BLM is to make a reasonable, good-faith effort to identify historic properties, determine whether identified properties are eligible for listing on the National Register (based on various criteria), assess the effects of an undertaking on any eligible historic properties found, and determine whether the effect will be adverse, and if so, avoid or mitigate any adverse effects.  36 C.F.R. § 800.

105.  BLM's RMP for the Monument (a decision that directs and forecloses future management decisions and includes both plan level and site-specific decisions) is an undertaking under the NHPA requiring consideration of all cultural and historic properties.

106.  In approving the RMP for the Monument, the BLM has failed to make a reasonable effort to identify historic and cultural properties in the Monument, make an eligibility determination for such properties, and assess how the new RMP may affect such properties.

107.  The BLM's failure to comply with the NHPA is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law " and constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706 (2)(A), 706 (1).

COUNT IV

FLPMA VIOLATIONS

108.  Plaintiff repeats and incorporates by reference the foregoing paragraphs.

109.   The BLM has violated, and continues to violate, FLMPA.

110.  In the development of an RMP, FLMPA requires the BLM to "give priority to the designation and protection of areas of critical environmental

1  concern [ACEC]." 42 U.S.C. § 1712 (c)(3).

2      111.  The BLM's ROD and new RMP for the Monument will adversely

3  impact and fails to protect the Cow Creek ACEC.

4      112.  Pursuant to FLPMA, the BLM must manage all WSAs in a "manner so

5  as not to impair the suitability of such areas for preservation of wilderness." 43

6  U.S.C. 1782 (c).

7      113.  The BLM's RMP will impact the wilderness character of the Antelope

8  Creek, Cow Creek, Dog Creek South, Ervin Ridge, Stafford, and Woodhawk

9  WSAs and impair the suitability of these WSAs for inclusion in the National

10  Wilderness Preservation System.

11      114.  Pursuant to FLPMA, the BLM is to manage areas for multiple use

12  except "where a tract of such public land has been dedicated to specific uses

13  according to any other provisions of law. 43 U.S.C. 1732 (a).

14      115.  The Proclamation establishing the Monument, which was done in

15  accordance with the Antiquities Act, dedicated the area for the specific use of

16  protecting the Monument's objects for future generations. The Monument is no

17  longer to be managed for multiple uses.

18      116.  The BLM's new RMP illegally manages the Monument for multiple

19  uses in violation of FLPMA.

20      117.  The BLM's RMP which fails to protect the Cow Creek ACEC, fails to

21  comply with its duty to not impair the suitability of the WSAs for preservation as

22  wilderness, and determines to manage the Monument for multiple use is "arbitrary,

23  capricious, an abuse of discretion, or otherwise not in accordance with law " and

24  constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C.

25  §§ 706 (2)(A), 706 (1).

26

27

28  PAGE 17  COMPLAINT  MWA v. TERLAND

1

COUNT V

2

PROCLAMATION VIOLATIONS

3     118.  Plaintiff repeats and incorporates by reference the foregoing

4  paragraphs.

5     119.  The BLM has violated, and continues to violate, the Proclamation

6  establishing the Monument.

7     120.  Pursuant to the Proclamation, the BLM must protect all objects of the

8  Monument.  66 Fed. Reg. 7361.  These objects include a "spectacular array of

9  biological, geological, and historical objects of interest." 66 Fed. Reg. 7359.

10  Specifically, the "objects" that the BLM must protect include specific sites

11  described by Lewis and Clark in their journals, mule deer, elk, and big horn sheep

12  herds and habitat, sage grouse, the fully functioning cottonwood gallery in the

13  lower reach of the Judith River, Arrow Creek and its important spawning habitat

14  for pallid sturgeon, the cliff faces of the Monument and how they provide perching

15  and nesting habitat for may species of raptors, the Cow Creek ACEC, the

16  UMNWSR, the Lewis and Clark National Historic Trail, the Nez Perce National

17  Historic Trail, the river's fish species (including paddlefish and the endangered

18  pallid sturgeon), the wild character and nature of the Bullwhacker area, the

19  numerous cultural sites, and the overall remoteness and undeveloped nature of the

20  area.

21     121.  The BLM's RMP fails to protect the Monument's objects as required

22  by the Proclamation.

23     123.  Pursuant to the Proclamation, the BLM must prohibit all motorized

24  and mechanized vehicle use "off road*"* except for emergency or authorized

25  administrative purposes. 66 Fed. Reg. 7361.  When this prohibition was created, to

26  be deemed a "road" a route must be "improved and maintained by mechanical

27  means." H.R. Rep. No. 94-1163 at 17 (1976).  The mere existence of "two-track"

28  PAGE 18  COMPLAINT  MWA v. TERLAND

1  ATV or jeep trails or any tracks created solely by the passage of motorized
2  vehicles did not constitute a road.

3     124.  The BLM's RMP for the Monument authorizes motorized and
4  mechanized vehicle use "off road" in violation of the Proclamation by: (1)
5  adopting a new definition of the word "road" that includes user-created two-track
6  routes that are not improved or maintained by mechanical means; (2) authorizing
7  off-road travel for leasees and permittees; and (3) authorizing off-road travel and
8  dispersed camping within a 100 foot wide corridor of a designated road.

9     125.  Pursuant to the Proclamation, no new oil and gas leases are allowed in
10 the Monument.  Only "valid existing rights" are allowed and the BLM is to
11 manage development of these valid existing oil and gas leases so as not to create
12 any new impacts that would interfere with the proper care and management of the
13 objects protected by this proclamation." 66 Fed. Reg. at 7361.

14    126.  In order to be deemed a "valid existing right" oil and gas leases in the
15 Monument must continue to produce oil or gas in paying quantities, 30 U.S.C. §
16 226 (b)(3)(D), and have been issued in compliance with NEPA.

17    127.  The BLM's RMP considers 43 oil and gas leases in the Monument to
18 be valid existing rights even though: (1) the BLM has never completed the
19 requisite paying quantities analysis for these 43 leases; (2) evidence submitted to
20 the BLM on the DEIS and protest of the ROD and RMP demonstrates that at least
21 29 of the 43 leases area invalid because they are not continuing to produce oil or
22 gas in paying quantities; and (3) the leases where not issued in compliance with
23 NEPA.

24    128.  The BLM's failure to protect the Monument's objects, authorization of
25 "off-road" travel, and determination that 43 oil and gas leases are valid existing
26 rights is "arbitrary, capricious, an abuse of discretion, or otherwise not in
27 accordance with law" (including 30 U.S.C. § 226) and constitutes "agency action
28 PAGE 19   COMPLAINT  MWA v. TERLAND

unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706 (2)(A), 706 (1).

PRAYER FOR RELIEF

129.  Plaintiff repeats and incorporates by reference the allegations of all foregoing paragraphs.

130.  WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

A.   Issue a declaratory judgment that the BLM's ROD and RMP for the National Monument violates NEPA, WSRA, NHPA, FLPMA, and the Proclamation as described in this complaint;

B.  Issue declaratory judgment that the BLM's violation of NEPA, WSRA, NHPA, FLPMA, and Proclamation as described in this complaint is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or constitutes agency action unlawfully withheld or unreasonably delayed under the APA;

C.  Issue a mandatory injunction setting aside the BLM's ROD, FEIS, and RMP and requiring the BLM to prepare a new EIS and RMP for the National Monument that complies with all applicable laws;

D.  Issue a mandatory and permanent injunction prohibiting the BLM from conducting and/or authorizing any and all new ground disturbing activity authorized by the new RMP that may or has the potential to adversely impact the Monument's resources.

E.  If necessary, issue a mandatory injunction ordering the BLM to mitigate and/or remedy any harm caused by the new RMP while this civil action was or is pending;

F.  Issue such additional relief as Plaintiff may subsequently request;

G.  Retain continuing jurisdiction of this matter until the BLM fully

PAGE 20   COMPLAINT  MWA v. TERLAND

1   remedies the violations of law complained of herein;

2       H.  Grant the Plaintiff its costs and expenses of litigation, including

3   reasonable attorneys' fees pursuant to the Equal Access to Justice Act (EAJA), 28

4   U.S.C § 2412;

5       I. Grant such other relief that this Court deems necessary, just, and proper.

6       Respectfully submitted this 18th day of June, 2009.

7                    /s/ Matthew Bishop
                     Matthew K. Bishop
8                    Western Environmental Law Center
                     103 Reeder's Alley
9                    Helena, MT 59601
                     (406) 324-8011 (tel.)
10                   (406) 443-6305 (fax)
                     bishop@westernlaw.org

11

12                   Sarah McMillan
                     Western Environmental Law Center
13                   Post Office Box 7435
                     Missoula, MT 59807
14                   (406) 728-5096 (tel.)
                     mcmillan@westernlaw.org

15
                     Attorneys for Plaintiff
16

17

18

19

20

21

22

23

24

25

26

27

28