FILED
GREAT FALLS DIV.

2011 AUG  9  AM 10 58

PATRICK E. DUFFY, CLERK
BY _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MONTANA

## GREAT FALLS DIVISION

| | |
|---|---|
| IN RE MONTANA WILDERNESS ASSOCIATION | No.  CV-09-95-GF-SEH |
| *This Document Relates to All Actions* | **MEMORANDUM AND ORDER** |

## PLEADING BACKGROUND

This case arises from the Bureau of Land Management's approval of the

Resource Management Plan ("Plan") for the Upper Missouri River Breaks

National Monument ("Monument") and from renewal of the Woodhawk Allotment

Grazing Permit.  The Wilderness Society, Friends of the Missouri River Breaks

Monument, National Trust for Historic Preservation, Oil and Gas Accountability

Project, Montana Wilderness Association, Western Watersheds Project, Inc.,

Glenn Monahan, and Nancy Schultz (collectively "Plaintiffs") filed complaints in

separate cases challenging the decisions.[1]  Defendants are the U.S. Department of

---

[1] The cases in the Great Falls Division were designated as follows: Mont. Wilderness Assn. v. Terland, No. CV-09-95-GF-SEH (D. Mont. filed June 18, 2009); The Wilderness Society v. USBLM, No. CV-09-96-GF-SEH (D. Mont. filed July 15, 2009); and Western Watersheds Project, Inc. v. Abbey, No. CV-10-04-GF-SEH (D. Mont. filed Nov. 20, 2009).

Interior, Bureau of Land Management, and various employees in their official

capacities (collectively "BLM").  Plaintiffs allege violations of the Administrative

Procedure Act ("APA"), 5 U.S.C. §§ 701-06, National Environmental Policy Act

("NEPA"), 42 U.S.C. §§ 4321-61, Wild and Scenic Rivers Act ("WSRA"), 16

U.S.C. §§ 1271-81, Federal Land and Policy Management Act of 1976

("FLPMA"), 43 U.S.C. §§ 1701-82, National Historic Preservation Act ("NHPA"),

16 U.S.C. §§ 470-470x-6, and the Proclamation designating the Monument, 66

Fed. Reg. 7,359 (Jan. 17, 2001).  The cases were consolidated.  Recreational

Aviation Foundation and Montana Pilots Association (collectively "Aviation

Group") and Missouri River Stewards, Fergus County, Phillips County, Chouteau

County, and Blaine County (collectively "Missouri River Stewards") appeared as

intervenors.

The Court granted BLM's motion to dismiss Count VII in Cause No. CV

10-04-GF-SEH, which alleged that BLM failed to complete supplemental analysis

of the Plan and Woodhawk Allotment Grazing Permit Environmental Assessment.

The Court also struck, upon motion of BLM, extra-record evidence contained in

summary judgment filings of Montana Wilderness Association and Western

Watersheds Project.  Refiling of the briefs in support of summary judgment

without the stricken material was ordered and was carried out.   All parties

ultimately filed motions for summary judgment. The issues have been fully briefed and a hearing conducted. All motions are ripe for ruling. The Court has jurisdiction under 28 U.S.C. § 1331.

## **FACTUAL BACKGROUND**[2]

On January 17, 2001, President Clinton issued a Proclamation under the Antiquities Act of 1906, establishing the Monument and designating BLM as managing agency. The Monument consists of some 377,346 acres of BLM land in north central Montana. It spans four counties–Blaine, Chouteau, Fergus, and Phillips. A checkerboarding of other land ownerships, including approximately 80,000 acres of private land and 39,000 acres of state land, is intermingled with the federal lands within the Monument. BLM has no authority over the private or state lands and minerals.

On April 24, 2002, BLM announced that it would develop a Plan for the Monument. A Draft Environmental Impact Statement ("Draft") was issued in September 2005, roughly three and one-half years later. It then issued a proposed Plan and Final Environmental Impact Statement in January 2008. The proposed Plan and Final Environmental Impact Statement contained six alternatives.

---

[2] The factual summary is drawn from the administrative record. See, e.g., Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985).

Alternative F was designated as the preferred alternative and was described as one that balanced objectives of the Monument, best met the diverse interests of all involved stakeholders, and provided the most workable framework for future management.[3]  BLM issued its Record of Decision and approved Plan in December 2008.  The approved Plan is virtually identical to Alternative F.

Numberous management decisions were made as a result of adoption of the Plan.  Some 146 miles of the Upper Missouri National Wild and Scenic River was closed to jet ski and float plane use.  Four of ten backcountry airstrips were closed. Previously allowed landings on roadways were prohibited.  New, specific conditions to protect Monument objects were placed on drilling natural gas wells on existing leases.  Range conditions for livestock grazing permits or leases were required to exceed the Standards for Rangeland Health and Guidelines for Livestock Grazing Management.  Of the 605 miles of roads located within the Monument, the Plan closed 201 miles (approximately 33%) year-round.  Another 120 miles (approximately 20%) were seasonally closed.  Each and all the decisions were challenged by Plaintiffs.

---

[3] Alternative F, *inter alia*, placed more restrictions on motorized use than every other alternative except Alternative E, closed more roads than Alternatives A, B, and C, closed the same or more backcountry airstrips than every other alternative except Alternative E, and imposed more restrictions on oil and gas operations than Alternatives A, B, and C.

## ISSUES

The issues before the Court may be summarized as follows:

1.    Did BLM violate the Proclamation or FLPMA by failing to:

    A.    Apply the appropriate standard?

    B.    Protect Monument objects?

    C.    Determine the validity of oil and gas leases?

    D.    Prohibit off-road vehicle use?

    E.    Prohibit impairment to wilderness study areas?

2.    Did BLM violate the WSRA by failing to:

    A.    Provide for outstandingly remarkable values?

    B.    Address user capacities in the Plan?

3.    Did BLM violate NEPA by failing to:

    A.    Consider a reasonable range of alternatives?

    B.    Take a "hard look" at the impacts of its decisions?

    C.    Prepare an EIS for renewal of the Woodhawk Allotment Grazing Permit?

    4.    Did BLM violate NHPA by failing to:

    A.    Consult with the State Historic Preservation Officer?

    B.    Comply with inventory requirements?

## STANDARD OF REVIEW

### *APA Standard*

The standards for administrative agency action review are well-settled. A court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Review of agency decisions is narrow. Earth Is. Inst. v. USFS, 442 F.3d 1147, 1156 (9th Cir. 2006), overruled on other grounds, Winter v. Nat. Resources Def. Council, Inc., 555 U.S. 7, 21-22 (2008). Courts are ill-equipped to substitute their judgment for that of agencies. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971), overruled on other grounds, Califano v. Sanders, 430 U.S. 99, 105 (1977). A decision is arbitrary and capricious if the agency has made a clear error of judgment, that is if it relied on factors not intended for consideration, failed to consider important aspects of the problem, offered explanations counter to the evidence, or offered explanations so implausible that they could not derive from expertise. Motor Veh. Mfrs. Assn., Inc. v. St. Farm Mut. Automobile Ins. Co., 463 U.S. 29, 43 (1983).

### *Summary Judgment Standard*

Summary judgment is appropriate if there are no genuine disputes of material fact and the moving party is entitled to judgment as a mater of law. Fed.

R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Final

agency actions are particularly susceptible to summary judgment because the

issues for resolution are those of law.  See Occidental Engr. Co. v. INS, 753 F.2d

766, 770 (9th Cir. 1985).

## DISCUSSION

### Proclamation and FLPMA

The Monument Proclamation directed BLM to reserve all lands owned or

controlled by the United States for protection of Monument objects.  66 Fed. Reg.

7359, 7361 (Jan. 17, 2001).  BLM operations are also governed by FLPMA.

Columbia Basin Land Protec. Assn. v. Schlesinger, 643 F.2d 585, 607 (9th Cir.

1981) (stating FLPMA is BLM's organic act).  Plaintiffs argue that BLM

subordinated directives of protection to multiple use principles.[4]  The claim lacks

merit.

The Proclamation required BLM to refer to "applicable legal authorities" to

implement intent behind designation of the Monument.  66 Fed. Reg. at 7361; see

also id. ("Laws, regulations, and policies followed by the [BLM] in issuing and

administering grazing permits or leases on lands under its jurisdiction shall

---

[4] The Court is asked to take judicial notice of a proclamation and resource management
plan for an entirely different area.  No demonstration has been made that these records are part of
the record on review or were relied upon by BLM.  Judicial notice is declined.  See, e.g., S.W.
Ctr. for Biological Diversity v. USFS, 100 F.3d 1443, 1450 (9th Cir. 1996).

continue to apply with regard to the lands in the [M]onument."). One such

applicable authority was the concept of multiple use, which declared that its

principles govern except when designated otherwise. 43 U.S.C. § 1732(a).

BLM interpreted how to best integrate multiple use with the Proclamation

as follows:

> The BLM's vision is to manage the Monument in a manner that
> maintains and protects its biological, geological, visual and historic
> objects and preserves its remote and scenic character. The RMP will
> incorporate the Proclamation, multiple use and existing laws, while
> recognizing valid existing rights and authorizations, and providing
> diverse recreational opportunities.

AR 44 (emphasis added); see also AR 64 ("Guidelines for Livestock Grazing

Management practices will be followed to protect the objects of the Monument

and rangeland resources and, where necessary, to mitigate conflicts with other

Monument uses and values."); AR 1011 (stating new management is needed

because management prior to designation may not sufficiently protect Monument

objects).

BLM did not denigrate the Proclamation by choosing to also abide by

multiple use principles. Rather, it instead sought to reconcile the two authorities.

Compare 43 U.S.C. § 1732(a) with 66 Fed. Reg. at 7361.[5] The interpretation that

---

[5] Western Watersheds Project presents additional arguments. It argues that BLM was
required to manage under the standard of protecting, restoring, and preserving objects within the
Monument. It also argues that BLM must manage the Monument in order to achieve potential
natural community. Nowhere are these requirements mandated by enforceable authority, BLM

providing for multiple use was required so long as Monument objects were

protected was reasonable. Cf. Udall v. Tallman, 380 U.S. 1, 16-18 (1965).[6]

### *Protection of Monument Objects*

Plaintiffs argue BLM has failed to protect objects of the Monument. As the

examples which follow demonstrate, the failure-to- protect-objects' argument

fails.

The Proclamation states:

> The Bullw[h]acker area of the [M]onument contains some of the
> wildest country on all the Great Plains, as well as important wildlife
> habitat. During the stress-inducing winter months, mule deer and elk
> move up to the area from the river, and antelope and sage grouse
> move down to the area from the benchlands. The heads of the
> coulees and breaks also contain archeological and historical sites,
> from teepee rings and remnants of historic trails to abandoned
> homesteads and lookout sites used by Meriwether Lewis.

66 Fed. Reg. at 7360. BLM addressed protection of objects within the

Bullwhacker area by reducing roads, by committing to monitoring aircraft if use

should increase, and by restricting motorized use on the Missouri River. See also

AR 26 (The Plan provides for "diverse visitor use in a manner consistent with

protecting Monument resources and values."); cf. Hells Canyon Alliance v. USFS,

---

interpretation, or legal argument. More importantly, the Plan, indeed, protects, restores, and
preserves the objects of the Monument. These arguments are therefore rejected.

[6] To the extent suggested that BLM predetermined its decision to rely upon multiple use,
a plaintiff must meet a high standard of proof. Cf. Forest Guardians v. USFWS, 611 F.3d 692,
713-14 (10th Cir. 2010). No such burden has been carried.

227 F.3d 1170, 1178 (9th Cir. 2000) (deference given to agency's determination of which uses are inconsistent with protection). Moreover, the interpretation that the Bullwhacker area itself is not a Monument object is supported by the Listing of Significant Objects that accompanied the Monument. AR 37203-21 (not listing the Bullwhacker area). The agency's interpretation is reasonable. Cf. Udall, 380 U.S. at 16-18. Protection of objects within and around the Bullwhacker has been accomplished. Nothing more is required.

BLM likewise protected sage grouse, riparian and upland habitats, and cottonwood galleries. See AR 51-53, 60-61, 1383, 44839, 44852-53, 44859-60. To the extent Plaintiffs argue that decisions in the Plan and Woodhawk Allotment Grazing Permit violated the "non-degradation" standard in FLPMA, no such requirement exists. FLPMA instead requires that "[i]n managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. 1732(b) (emphasis added). Not only was this claim misstated and waived for failure to raise it in opening briefing, no such unnecessary or undue degradation has been demonstrated. Even if such degradation could occur, BLM will monitor the potential impacts under adaptive management to ensure that no such degradation arises. See AR 59-60; Gardner v. USBLM, 638 F.3d 1217, 1222 (9th Cir. 2011).

-10-

## *Oil and Gas Leases*

The Proclamation provides:

> The establishment of this [M]onument is subject to valid existing
> rights. The Secretary of the Interior shall manage development on
> existing oil and gas leases within the [M]onument, subject to valid
> existing rights, so as not to create any new impacts that would
> interfere with the proper care and management of the objects
> protected by this [P]roclamation.

66 Fed. Reg. at 7361. Plaintiffs argue that BLM should have verified the validity

of oil and gas leases rather than deem them valid by virtue of the Proclamation.

Such verification of validity was not required.

BLM addressed the leases. AR 29249 ("In February 2002, all the leases

within the Monument were reviewed and were determined that they remain in

good standing."). Even were this not the case, nothing in the Proclamation or

other legal authority required the agency to determine validity of the leases. At

most, the Proclamation required that such rights be managed to prevent new,

adverse impacts on Monument objects. 66 Fed. Reg. at 7361. Although it is

argued BLM deemed all leases to be valid, the Record of Decision did not

formally determine the validity of such leases. See AR 21 (not listing validity

determination of oil and gas leases as an implementation-level decision). At best,

a challenge has been levied against a non-existent validity determination. See 5

U.S.C. § 704 (requiring "final agency action" for review); see also Norton v. S.

-11-

<u>Utah Wilderness Alliance</u>, 542 U.S. 55, 63-64 (2004).  BLM action, or lack thereof, with respect to oil and gas leases was not arbitrary and capricious.[7]

### *Off-Road Vehicle Use*

The Proclamation states, "[f]or the purpose of protecting the objects identified above, the Secretary shall prohibit all motorized and mechanized vehicle use off road, except for emergency or authorized administrative purposes."  66 Fed. Reg. at 7361.  No definition for "road" is provided.  BLM therefore defined road as follows: "a linear route segment that can be created by the passage of vehicles (two-track); constructed; improved; or maintained for motorized travel."  AR 93.  The fact that unmaintained two-tracks are included in the definition is at the heart of the dispute.

BLM used definitions of road similar to the one currently under challenge before the definition utilized in the Monument was selected.  <u>See, e.g.</u>, AR 15, 32070, 33282.  More restrictive definitions of road cited by Plaintiffs are, in fact, applicable to regulatory schemes for wilderness.  <u>See, e.g.</u>, 43 C.F.R. § 19.2(e).  There is no suggestion, however, that the President intended BLM to define a road based upon definitions outlined by Plaintiffs.  BLM was free to choose the

---

[7] Plaintiffs imply that BLM has also violated NEPA by not determining the validity of oil and gas leases in the Monument.  To the extent asserted, this claim is rejected for failure to develop sufficient argument.  <u>See</u> <u>Christian Legal Socy. Chapter of U. of Cal. v. Wu</u>, 626 F.3d 483, 488 (9th Cir. 2010).

definition as it deemed most appropriate.  No showing has been made that the

chosen definition is unreasonable, rendering it arbitrary and capricious.[8]  Cf.

Kester v. Campbell, 652 F.2d 13, 15-16 (9th Cir. 1981) (citing cases).  No further

explanation was required than that provided by the agency.  See Alaska Dept. of

Envtl. Conserv. v. EPA, 540 U.S. 461, 496-97 (2004).[9]

The assertion is made that BLM violated the Proclamation's prohibition on

off-road travel by allowing a vehicle to pull off the road up to fifty feet on each

side.  The argument fails.

The Plan allows vehicles to pass each other by providing for a fifty-foot

buffer on each side of a road.  In order for two vehicles to pass on narrow roads,

one, and possibly even both, must drive off the road.  The Proclamation has

allowed for vehicle passage, inclusive of activities consistent with such passage

and parking, as an administrative purpose to provide for safety.  See AR 98

---

[8] It is plausible that the same piece of real estate within a wilderness study area could be deemed a "road" when referring to the Proclamation and "not a road," i.e. a "vehicle way," when referring to FLPMA.  Compare AR 93 with H.R. Rpt. 94-1163 § 311 (May 15, 1975).  This distinction has likewise not been demonstrated to be unreasonable.

[9] Plaintiffs additionally cite to a BLM official's statement that the Monument planning team "made the decision at the outset of this planning process . . . to consider the two tracks or routes created by passage of vehicles as resource roads for the [M]onument trans plan."  AR 16592.  Although this statement may have been imprudent, it at worst shows BLM identified a preferred course of action.  Cf. Natl. Audubon Socy. v. Dept. of Navy, 422 F.3d 174, 199 (4th Cir. 2005) (instructing that courts will not determine "alleged subjective intent of agency personnel divined through selective quotations from email trails").  No predetermination has been demonstrated.

("Outside of the WSAs, motorized or mechanized vehicles may park adjacent to a road to provide a reasonable safe distance for the public to pass."); AR 222 (clarifying that "the monitoring and management of road safety within the Monument is an administrative purpose"). This interpretation is reasonable, see Kester, 652 F.2d at 15-16, and does not violate the Proclamation against "off road" travel, "except for emergency or authorized administrative purposes." 66 Fed. Reg. at 7361.

### *Non-Impairment Standard*

Under the terms of the FLPMA, Congress mandated that the Secretary "review those roadless areas of five thousand acres or more and roadless islands of the public lands . . . ." 43 U.S.C. § 1782(a). Congress could then designate the land as wilderness or not. During the interim, "the Secretary shall continue to manage such lands . . . in a manner so as not to impair the suitability of such areas for preservation as wilderness . . . ." Id. at § 1782(c) (emphasis added).

The legislative history explains that the term road "refers to the absence of roads which have been improved and maintained by mechanical means to insure relatively regular and continuous use." H.R. Rpt. 94-1163 at § 311 (emphasis added). By this definition, a "vehicle way," meaning "[a] way maintained solely by the passage of vehicles," does not qualify as a road. Id.

-14-

Plaintiffs argue that BLM violated the above non-impairment standard by roading previously unroaded wilderness study areas.  This assertion mischaracterizes the thrust of BLM's decision.  First, motorized travel in wilderness study areas has always been allowed.  <u>See</u> AR 37294.  Second, BLM interpreted the term "roads" under the Proclamation to include "vehicle ways."  It does not follow, however, that the wilderness study areas have become "roaded" under different statutory schemes, namely FLPMA and the non-impairment mandate.  When referring to FLPMA and the non-impairment mandate, "roads," as that term is understood to mean in the Proclamation, will remain as unmaintained "vehicle ways."  Congress remains entitled to designate these areas as wilderness if it so chooses.  Further, BLM has repeatedly stated that it will refer to its Interim Management Policy to ensure that no wilderness study areas in the Monument are impaired.  <u>See, e.g.</u>, AR 99 ("All WSAs will be managed according to the Interim Management Plan . . . and Guidelines for Lands Under Wilderness Review . . . until such time as Congress acts upon the recommendations."); AR 100 ("[P]rimitive vehicle routes ('ways') . . . may be used and maintained as before, as long as this does not cause new impacts that will impair the area's wilderness suitability.").  Plaintiffs' claims that BLM has violated the non-impairment standard are therefore unfounded.

## WILD AND SCENIC RIVERS ACT

Congress passed the WSRA to protect outstandingly remarkable values of selected rivers for the enjoyment of current and future generations.  16 U.S.C. §§ 1271, 1281(a).  The Upper Missouri National Wild and Scenic River, 149 miles of which flows within the Monument, has been designated as such an area. 16 U.S.C. § 1274(14).  The designating Act mandated BLM to manage the river under the WSRA, Taylor Grazing Act, and multiple use and sustained yield.  Pub. L. No. 94-486 at § 203(a) (Oct. 12, 1976).  To carry out the mandate, BLM classified the river into three wild, two scenic, and two recreational segments.  See 16 U.S.C. § 1273(b) (discussing distinctions between wild, scenic, and recreational).

### *Protection and Enhancement of the Outstandingly Remarkable Values*

All parties agree that solitude is an outstandingly remarkable value.[10]  The dispute arises because Plaintiffs claim BLM failed to determine whether motorized use in the wild segments of the river are consistent with the WSRA's directive to "protect and enhance" special values, namely solitude.

---

[10] Outstandingly remarkable values are those values justifying initial designation of the river under the WSRA and provide a benchmark for evaluating proposed projects that could impact the designated river.  Friends of Yosemite Valley v. Kempthorne, 520 F.3d 1024, 1027 (9th Cir. 2008) (citing 16 U.S.C. § 1271).

-16-

Recreation is likewise an outstandingly remarkable value. In 1975, the Bureau of Outdoor Recreation recommended designation of the river based, in part, on the available recreational opportunities. A Senate Report issued in connection with the WSRA also acknowledged the importance of recreation, even stating that all uses except impoundment would continue "without significant interference." Sen. Rpt. 94-502 at 5-6, 9 (Dec. 1, 1975). BLM has consistently interpreted recreation to include motorized recreation. See, e.g., AR 35740 (recognizing in 1978 that "[b]oth motorized and non-motorized watercraft will be permitted in all river segments"); AR 30314 (recognizing in 1993 that "[c]hances for recreational activities will be available to . . . motorized watercraft users"); AR 2234 (permitting motorboat use existing at the time of designation).

BLM's decision on how best to balance the values of solitude and recreation is entitled to deference. See River Runners for Wilderness v. Martin, 593 F.3d 1064, 1080 (9th Cir. 2010). The agency attempted to provide diverse recreational opportunities while at the same time preserving other outstandingly remarkable values of the river. AR 1423. It arrived at its decision by recognizing that "beauty and the solitude along the [river] are highly important to many visitors" and acknowledged that "the sight, sound and smell of motorized craft . . . may detract from [a] primitive experience . . . ." AR 1240, 1423; see also AR 1415-22, 1424,

-17-

1428, 1430-33.  Motorized opportunities allowed prior to designation of the
Monument were discontinued near the river, including seasonal restrictions on
roads, closure of 34 miles of roads, and implementation of watercraft and float
plane restrictions.  AR 79-83, 2072.

     The remaining complaints directed to the existence of roads, grazing, and
airstrips are without merit.  Such uses and features are inconspicuous, lawfully
existed prior to enactment of WSRA, and are not currently prohibited in wild
segments of the river.  See 16 U.S.C. § 1273(b)(1); 47 Fed. Reg. 39454, 39457-58
(Sept. 7, 1982); cf. Wilderness Watch v. USFS, 143 F. Supp. 2d 1186, 1195, 1204-
07 (D. Mont. 2000).  BLM concluded its analysis by pointing out where non-
motorized experiences of solitude were available and determined that it had
accomplished the goal of providing "diverse recreation experiences to the most
people while preserving the outstanding remarkable values of the river."  AR
1423; see also AR 1512-13, 1898, 1904, 1907, 1945.  The propriety of the
decision was reaffirmed in the Plan.  BLM undertook and carried out the
unenviable task of balancing solitude and recreation.  Its decision was not
arbitrary and capricious.

### *User Capacities in the Resource Management Plan*

WSRA requires that agencies address user capacities on designated rivers. 16 U.S.C. § 1274(d). If the river was designated on or after January 1, 1986, the governing agency must address user capacities within three full fiscal years after designation. Id. at § 1274(d)(1). Rivers designated before January 1, 1986, were given a grace period of ten years for compliance. Id. at § 1274(d)(2). The Missouri received its designation in 1976. AR 35721.

BLM set out to comply with the mandate of § 1274 by developing a River Management Plan ("River Plan") in 1978. The River Plan was updated in 1993 ("Update").[11] The Monument Plan calls for management of the river as follows:

> [The river] is guided by the 1993 River Plan Update . . . . The River Plan Update identified the specific actions necessary to implement guidance provided by the [1992] West HiLine RMP . . . and to revise some outdated management actions. In the future, the [R]iver [P]lan will be updated based on the guidance from the [Monument] . . . Plan.

AR 79. The River Plan will be updated again after the Monument Plan and EIS have been finalized. AR 14330.

BLM has complied with the statutory requirement to address user capacities through the River Plan and Update. To the extent the Monument Plan amended

---

[11] The 1978 River Plan and 1993 Update are not the subject of this dispute. See 28 U.S.C. § 2401(a) (six-year statute of limitations).

management of the river, it did so only to comply with the Proclamation: "There is a need for this . . . [Monument] Plan because the existing management of the Monument, governed by the . . . Upper Missouri National Wild and Scenic River Management Plan Update . . . may not always . . . sufficiently protect the objects as identified in the Proclamation." AR 34. These actions did not require BLM start afresh and address user capacities at this specific juncture. Cf. Friends of Yosemite Valley, 348 F.3d at 796-97 (not reviewing resource management plan). BLM's decision to not address user capacities in the Monument Plan was not arbitrary and capricious.

## NATIONAL ENVIRONMENTAL POLICY ACT

NEPA is a procedural statute. Inland Empire Pub. Lands Council v. USFS, 88 F.3d 754, 758 (9th Cir. 1996). Agencies must consider significant environmental impacts of a proposed action and inform the public that environmental concerns are a part of the decision. Balt. Gas and Elec. Co. v. Nat. Resources Def. Council, Inc., 462 U.S. 87, 97 (1983); 40 C.F.R. § 1502.1. The courts and NEPA require that the agency take a "hard look" when operating under NEPA. However, the statute mandates no particular substantive outcomes. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350-51 (1989).

***Reasonable Range of Alternatives for Backcountry Airstrip Management***[12]

Courts review the scope and consideration of alternatives set forth by the agency as required by NEPA under a "rule of reason." City of Carmel-By-The-Sea v. USDOT, 123 F.3d 1142, 1150-51 (9th Cir. 1997). The purpose and need of an environmental impact statement confines the appropriate range of alternatives. 40 C.F.R. § 1502.13.

The purpose and need stated in the proposed Plan and Final EIS was creation of a comprehensive plan for transportation and visitor use that also protected Monument objects. AR 1011, 1134. Six alternatives based upon that purpose were considered. Alternative A preserved the status quo, allowing all ten existing airstrips to remain open. Alternative B allowed all ten airstrips to remain open and authorized additional airstrips to open after further environmental review. Alternative C allowed seven airstrips to remain open, restricted three of the remaining seven to seasonal use, and closed three. Alternative D allowed six airstrips to remain open, restricted four to seasonal use, and closed four. Alternative E closed all ten airstrips. Alternative F, which was ultimately selected,

---

[12] BLM argues that Plaintiffs waived this argument by not raising the issue during the administrative comment period. Plaintiffs commented that "[t]he draft RMP's range of alternatives relative to backcountry airstrips is woefully inadequate" because "[t]he range goes from ten strips to seven to six to none." AR 7562-63. The issue was preserved for review.

allowed six airstrips to remain open, restricted one to seasonal use, and closed four.

The considered alternatives provided a reasonable range. Plaintiffs' demand that BLM consider a "middle ground" alternative is prohibited. See Vt. Yankee Nuclear Power Corp., 435 U.S. at 549. Even were the Court tempted to impose a "middle ground" requirement, it is clear BLM considered such an alternative. The closing of none, three, four, and all ten backcountry airstrips was analyzed. A reasonable range of alternatives was considered.[13]

### *"Hard Look" at the Impacts of BLM's Decisions*

Plaintiffs argue that BLM failed to take a hard look at the impacts on objects of the Monument, inclusive of those on the river, elk, bighorn sheep, sage brush obligates, and the Bullwhacker area. Again, the argument falls short in light of the record.

Plaintiffs have failed to identify any other past, present, or reasonably foreseeable projects that should have been accounted for in the agency's cumulative impacts analysis. See 40 C.F.R. § 1508.7; Bering Strait Citizens for

---

[13] Western Watersheds Project is unclear whether it also alleges a violation of NEPA for failure to consider an alternative to achieve potential natural community in riparian or upland areas. The argument is rejected for failure to develop the issue and because BLM, indeed, considered such an alternative but chose to reject it. AR 44844; see also N. Alaska Envtl. Ctr. v. Kempthorne, 457 F.3d 969, 978-79 (9th Cir. 2006).

<u>Responsible Resource Development v. U.S. Army Corps of Engrs.</u>, 524 F.3d 938, 955 (9th Cir. 2008) (denying claim, in part, because the Plaintiff "pointed to no past, present, or reasonably foreseeable future projects comparable in environmental impact"). Moreover, BLM, indeed, addressed cumulative impacts. <u>See, e.g.</u>, AR 1280-81 (stating the cumulative impacts' analysis is addressed in the environmental consequences for each resource at the end of each section). No more was required.

BLM also took the required hard look at direct and indirect impacts.[14] Although Plaintiffs appeared to challenge protection of the river generally, reply briefs disclose the true dispute exists over preservation of opportunities for solitude. BLM took the hard look at impacts on such opportunities by balancing solitude with recreation, as required by the WSRA, and by analyzing the impacts on the river's visual quality, primitive experience, and scenic character. <u>See, e.g.</u>, AR 1286, 1370-76, 1392-1443.

BLM also analyzed the Monument's elk, bighorn sheep, and sagebrush obligates.[15] The cumulative, direct, and indirect impacts were analyzed, including

---

[14] Plaintiffs appeared to exclusively challenge BLM's cumulative impacts' analysis in initial briefing. Later briefing suggests the challenge extends to direct and indirect impacts' analysis, as well.

[15] Plaintiffs suggest by footnote that BLM also violated NEPA by not considering the Plan's impacts on cultural resources resulting from backcountry airstrips. This argument is abandoned in later briefing. The record also demonstrates that such impacts were, indeed,

those on elk and bighorn sheep from air quality, cultural resources management, mineral extraction, soil health, livestock grazing, water quality, recreation, and traffic. See, e.g., AR 1295-1333,1383-87, 1499.[16] The preferred alternative was selected to "improve habitat or habitat security for . . . some important big game habitats by limiting additional disturbances from most activities, reducing noise, reducing traffic and total miles of open roads, which could reduce total disturbances to wildlife and provide larger blocks of secure habitat." AR 1333. BLM, likewise, analyzed the impacts on sagebrush obligates. See, e.g., 1295-1307, 1311-1333.

While BLM readily admits that it did not conduct an analysis of the impacts on the Bullwhacker area in one portion of the EIS, it was not required to do so. See, e.g., 40 C.F.R. § 1502.10. Moreover, the Bullwhacker area is not itself a Monument object, as already noted. The agency has taken a hard look at the impacts within, as well as outside, the Bullwhacker area. No more is necessary.

Finally, BLM took a hard look at the impacts of grazing. The detail recorded in an EIS depends upon the nature and scope of the action proposed by

---

considered. See, e.g., AR 1281, 1293-95, 1329-31, 1360, 1430-31, 1442-44, 1453, 1462-66, 1477.

[16] BLM purports only to manage habitat for wildlife. It does not manage the wildlife itself. AR 258; see also Baldwin v. Fish and Game Commn. of Mont., 436 U.S. 371, 384-86 (1978).

the agency. <u>Cal. v. Block,</u> 690 F.2d 753, 761 (9th Cir. 1982). BLM deemed the programmatic administration of grazing to be outside the scope of the Plan. <u>See</u> <u>Kleppe v. Sierra Club,</u> 427 U.S. 390, 414 (1976). Its decision was not political, but rather was based on the plain language of the Proclamation. <u>See</u> 66 Fed. Reg. at 7361. BLM therefore only analyzed the impacts of grazing as applied to all alternatives.

The topics of analysis included, *inter alia*, cultural resources, fish and wildlife, riparian areas, woody vegetation density, river bank trampling, invasive and noxious plants, water, and economics. <u>See, e.g.,</u> AR 1205-07, 1281, 1290, 1295-98, 1335, 1361, 1364, 1467-68. To the extent Plaintiffs claim BLM inappropriately "reverse-tiered" the Monument EIS to watershed analyses, the assertion lacks merit. <u>See, e.g.,</u> AR 205 ("The Final EIS includes an analysis of the impacts anticipated from livestock grazing decisions common to all alternatives. This analysis is not taken from the analysis in the watershed plans.").

While it may have been possible to explore impacts more vigorously and discuss them more thoroughly, reality of process requires the agency to make a decision. It has done so here. Plaintiffs have failed to demonstrate that the impacts analysis' within the over 1,200-page FEIS failed to take the requisite hard look.

### BLM's Decision to Prepare an Environmental Assessment for the Woodhawk Allotment Grazing Permit Renewal

BLM prepared an Environmental Assessment for the renewal of the Woodhawk Allotment Grazing Permit. Plaintiffs challenge that decision, arguing BLM should have prepared an EIS.

Agencies must develop EISs for "major Federal actions significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332(2)(C). If the agency determines that no significant effects exist, it is to issue a Finding of No Significant Impact and not prepare an EIS. 40 C.F.R. § 1508.9(a)(1).

None of the factors listed in the regulation defining significant are present. See 40 C.F.R. § 1508.27. Additionally, BLM, relying upon its expertise, found that its additional restrictions would "improve riparian and water quality conditions that are currently not in conformance with Standards for Rangeland Health and Guidelines for Livestock Management while maintaining or improving conditions on the allotment that are already in conformance." AR 44839. BLM has convincingly demonstrated that the impacts of the Woodhawk Allotment Grazing Permit are insignificant. No EIS was required.

## NATIONAL HISTORIC PRESERVATION ACT

NHPA requires agencies to consider impacts of an undertaking on objects eligible for inclusion in the National Register. 16 U.S.C. § 470f. An undertaking

-26-

occurs when an agency having direct or indirect jurisdiction funds in whole or in part a project, activity, or program. 36 C.F.R. § 800.16(y).

### Consultation with Montana State Historic Preservation Officer

An agency engaging in an undertaking must consult with the State Historic Preservation Officer ("Officer"). 36 C.F.R. §§ 800.3(c)(3), 800.16(v). Consultation occurs when an agency has consulted with the Officer "in a manner appropriate to the agency planning process for the undertaking and to the nature of the undertaking and its effects on historic properties." 36 C.F.R. § 800.3(c)(3). BLM and the Officer previously agreed that consultation was "appropriate" when the following occurred:

> Each Field Office responsible for preparing a comprehensive land use plan will at the beginning [of] its planning effort, invite the [Officer] to participate in scoping for the purpose of identifying issues that should be addressed in the plan. The BLM will invite the [Officer] to comment on any proposed cultural resource use allocations that are made in regional, local, or project plans. Field Offices will send all draft and final land use plans and cultural resource project plans to the [Officer] for review and comment.

AR 37250.

BLM conceded that it was appropriate to provide further documentation that consultation, indeed, took place with the Officer.[17] The Court directed

---

[17] Missouri River Stewards challenge standing of Plaintiffs to assert claims based on alleged deficiencies in BLM's consultation. Compare San Juan Citizens Alliance v. Norton, 586 F. Supp. 2d 1270, 1293 (D. N.M. 2008) with Attakai v. U.S., 746 F. Supp. 1395, 1405-09 (D.

supplementation. See, e.g., Citizens to Preserve Overton Park, Inc., 401 U.S. at

419-20. Supplementation revealed that BLM invited the Officer to participate in

scoping and comment on cultural resource use allocations during planning efforts.

See, e.g., AR 229, 15904, 18973, 19954, 46503, 46508-09, 46523. Draft and final

plans for the Monument were also sent to the Officer. AR 8, 996, 14004, 46517,

46521-22. Appropriate consultation with the Officer as required by NHPA was

carried out.

### *Inventory Requirements*

Plaintiffs argue that BLM violated NHPA by not conducting a Class II or III

inventory[18] of historical properties. BLM responds that the level of inventory

depends upon the particular decision at issue, and that it was not required to

conduct a Class II or III inventory because no new surface disturbance had

occurred and only a regional overview was required.[19]

---

Ariz. 1990). This issue need not be resolved. Even if the Court concluded standing existed,
BLM complied with consultation requirements.

[18] A Class III inventory is an "intense" and "professionally conducted, thorough
pedestrian survey of an entire target area (except for any subareas exempted), intended to locate
and record all historic properties." BLM Manual 8110–Identifying and Evaluating Cultural
Properties at .21B4 (Dec. 3, 2004); see also Te-Moak Tribe of W. Shoshone Nev. v. USDOI, 608
F.3d 592, 601 n. 10 (9th Cir. 2010). A Class III inventory is different from a Class I inventory,
which considers existing information, and from a Class II inventory, which includes statistically-
based surveys. BLM Manual 8110–Identifying and Evaluating Cultural Properties at 2.

[19] BLM concedes, as it must, that its actions were an undertaking and were it to "propose
any new routes or road relocations," it would be required to conduct "cultural resource

-28-

An agency engaging in such an inventory must make a reasonable and good faith effort to inventory the area's historical properties within the area of potential effects. 16 U.S.C. § 470f; 36 C.F.R. § 800.4(b)(1). Cultural resource specialists from Northwind here identified 383 sites.[20] BLM previously conducted Class II and Class III inventories of approximately 60,000 acres of the Monument, approximately 31,000 of which is attributable to a Class III inventory. AR 1187-88. No new roads, parking areas, motorboat use, airstrips, or camping areas were allowed in the Monument. Motorized traffic will remain low on open roads. See, e.g., AR 1285, 1521, 2050, 2101. Should use due to other types of transportation increase, management actions can be taken to reduce concentration. See, e.g., AR 1043, 1433, 1443-44, 5825. Class II or III inventories are not necessary if the status quo remains, restricts use, travel has not concentrated, or the analysis is done at the planning level. See, e.g., AR 36360 (Instruction Manual No. 2007-030); AR 37170 (Information Bulletin No. 2002-101). While a Class II inventory is appropriate under certain circumstances, the site density for the Monument is 1

---

inventories in compliance with Section 106 of the National Historic Preservation Act." AR 1293. The agency is also completing proactive cultural resource inventories under Section 110 of NHPA. AR 238.

[20] Although it was recommended by the Northwind cultural resources specialists that a Class III inventory be conducted, this third-party recommendation does not alone impose a legal requirement on BLM to do so.

per 2,168 acres.  BLM deemed a Class I inventory, consistent with internal agency

guidance, sufficient.  AR 1482, 1668; see also Vt. Yankee Nuclear Power Corp.,

435 U.S. at 549 (stating courts may not "impose upon the agency [their] own

notion of which procedures are 'best'").  BLM complied with the inventory

requirements of NHPA by considering existing information.[21]

## CONCLUSION

Plaintiffs have failed to carry their burden under the Administrative

Procedure Act.  See 5 U.S.C. § 706(2)(A).  All requirements of law have been met.

ORDERED:

1.      BLM's Motion for Summary Judgment[22] is GRANTED.

2.      Missouri River Stewards' Motion for Summary Judgment[23] is

GRANTED.

_____

[21] To the extent Plaintiffs challenge BLM's general overview of cultural resources
information in the Plan, programmatic attacks are not judicially reviewable because no site-
specific action has been taken.  See San Juan Citizens Alliance, 586 F. Supp. 2d at 1294.
Challenges to yet undecided actions concerning camping facilities are likewise insulated from
review.  See Bennett v. Spear, 520 U.S. 154, 178 (1997).

[22] Document No. 142 in CV-09-95-GF-SEH, Document No. 134 in CV-09-96-GF-SEH,
and Document No. 106 in CV-10-04-GF-SEH.

[23] Document No. 135 in CV-09-95-GF-SEH, Document No. 127 in CV-09-96-GF-SEH,
and Document No. 99 in CV-10-04-GF-SEH.

3.      Aviation Group's Motion for Summary Judgment[24] is GRANTED.

4.      Plaintiffs' Motions for Summary Judgment[25] are DENIED.

5.      The Clerk is directed to enter judgment accordingly.

DATED this 9th day of August, 2011.

SAM E. HADDON
United States District Judge

---

[24] Document No. 138 in CV-09-95-GF-SEH, Document No. 130 in CV-09-96-GF-SEH, and Document No. 102 in CV-10-04-GF-SEH.

[25] Document Nos. 89, 93, and 94 in CV-09-95-GF-SEH, Document Nos. 88 and 89 in CV-09-96-GF-SEH, and Document Nos. 53, 57, and 58 in CV-10-04-GF-SEH.